**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------

S.S. and T.S., on behalf of S.S.,

Plaintiffs

- against -                                              **COMPLAINT**

New York City Department of Education,                   **08 CV 2022 (SAS)**

Defendant.

----------------------------------------------------------------

Plaintiffs, S.S. and T.S., on behalf of S.S., by their attorneys, Mayerson & Associates, as and for their Complaint, allege and state the following:

1. Plaintiff S.S., the daughter of plaintiffs S.S. and T.S., is a minor child who has been diagnosed with a serious autism spectrum disorder. S.S. was at all relevant times was and is a student residing within the New York City School District entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400, *et. seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education law and Part 200 of the Commissioner's Regulations.

2. Plaintiffs S.S. and T.S. are the parents of S.S. Plaintiffs are residents of the State of New York, residing at all relevant times at an address within the New York City Department of Education's Region 9, District 2.

3. S.S. and her parents S.S. and T.S. are not expressly identified herein because of the privacy guarantees provided in the IDEIA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

4.   Defendant New York City Department of Education ("NYCDOE"), upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligations to provide S.S. with a free and appropriate public education ("FAPE"), *see infra*, ¶ 8.

### THE RELIEF BEING SOUGHT

5.   This action is brought pursuant to the provisions of 20 U.S.C. § 1400, *et. seq.*, more commonly known as the IDEIA and, in particular, 20 U.S.C. §§ 1415(i)(2) and (3).  *See also*, 34 C.F.R. §§ 300.516 and 300.517.

6.   This action is being brought to secure statutory attorneys' fees that plaintiffs are entitled to recover pursuant to the fee-shifting provisions of the federal IDEIA statute, 20 U.S.C. §§ 1415(i)(3)(A)-(G).  S.S. and T.S., on behalf of S.S. should be awarded attorneys' fees as the substantially prevailing party in a due process hearing for the 2006-2007 and 2007-2008 school years under New York City Impartial Hearing Office Case Numbers 105708 and 112193, respectively.

### JURISDICTION AND VENUE

7.   This Court, pursuant to 20 U.S.C. §§ 1415(i)(2) and (3), 34 C.F.R. §§ 300.516 and 300.517, 28 U.S.C. §§ 1331 and 1367, has jurisdiction of this action without regard to the amount in controversy.  Venue is proper in that plaintiff and defendant both reside in or are situated in this District.

8.   Pursuant to the IDEIA statute, as well as the New York State Education Law, all school agencies within the State are required to offer eligible students with disabilities special education programs and services that are tailored to meet the individual needs of each child with a

disability.  The FAPE required under IDEIA will be different for each child, as IDEIA does not accept a "one size fits all" approach.

### FACTUAL BACKGROUND FOR THE 2006-2007 SCHOOL YEAR

9.  On or about August 4, 2006, and amended September 5, 2006, S.S. and T.S., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2006-2007 school year for the cost and expenses of S.S.'s tuition and related services.  S.S.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized for S.S.'s specialized needs.

10. The evidentiary hearing on this matter took place on September 15, 2006, January 30, 2007, and March 20, 2007.  Gary S. Mayerson, Esq., of Mayerson & Associates represented the plaintiff.  The NYCDOE contended they offered S.S. with FAPE, satisfying Prong I of the Burlington/Carter test for relief.[1]  Plaintiffs bore the burden of proof in regards to the appropriateness of the services provided to S.S.

11. The impartial hearing officer heard testimony from S.S.'s witnesses regarding the appropriateness of the services provided by private providers secured by S.S.'s parents.  The NYCDOE did not offer any testimony, documentary evidence, or argument challenging the appropriateness of the program privately arranged by S.S.'s parents.

12. By "Findings of Fact and Decision" date April 26, 2007, Impartial Hearing Officer Amy Lynne Itzla, Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the

---

[1] Reference is made to School Committee of Burlington v. Dept. of Educ. of Massachusetts, 471 U.S. 359, 105 S.Ct. 1996 (1985), and Florence Court School Dist. Four v. Carter, 510 U.S. 7, 114 S.Ct. 361 (1993), which set the standards for determining whether a handicapped child's unilateral educational placement is eligible for reimbursement relief.

substantially prevailing party in this administrative due process proceeding.[2]  Defendant never appealed from this decision, which thus became final and non-appealable on or about June 1, 2007.

### FACTUAL BACKGROUND FOR THE 2007-2008 SCHOOL YEAR

13. On or about September 20, 2007, S.S. and T.S., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2007-2008 school year for the cost and expenses of S.S.'s program and services.  S.S.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized for S.S.'s specialized needs.

14. The evidentiary hearing on this matter took place on October 10, 2007 and November 7, 2007.  Gary S. Mayerson, Esq., and Randi M. Rothberg, Esq., of Mayerson & Associates represented the plaintiff.  The NYCDOE conceded Prong I of the Burlington/Carter test. However, the NYCDOE challenged the appropriateness of S.S.'s home-based program and also did not concede Prong III.  Plaintiffs bore the burden of proof in regards to the appropriateness of the services provided to S.S..

15. The impartial hearing officer heard testimony from S.S.'s witnesses regarding the appropriateness of the services provided by private providers secured by S.S.'s parents.  The NYCDOE did not offer any testimony or documentary evidence regarding the claims raised by S.S.'s parents.

16. By "Findings of Fact and Decision" date October 29, 2007, Impartial Hearing Officer Judith T. Kramer, Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the

---

[2] A copy of this decision is annexed hereto as Exhibit A.  Please note that all exhibits have been redacted so as to protect particular family member's identity.

substantially prevailing party in this administrative due process proceeding.[3]  Defendant never appealed from this underlying administrative decision, which thus became final and non-appealable on or about December 3, 2007.

### CONCLUSION

17. The defendant is liable to pay plaintiffs their reasonable attorneys' fees arising out of S.S.'s IDEIA administrative due process proceedings, and in this action.  The fees requested herein are entirely reasonable and appropriate because:

(a) upon information and belief, plaintiffs' attorneys' office is the only firm in the country whose practice is devoted almost exclusively to representing children and adolescents with autism spectrum disorders, like S.S., in educational rights disputes;

(b) the principal of plaintiffs' attorneys' firm has testified before the United States Congress on the subject of the educational rights of children diagnosed with autism spectrum disorders;

(c) plaintiffs' attorneys have published and presented on the subject of the educational rights of children diagnosed with autism spectrum disorders;

(d) plaintiffs' attorneys have special knowledge and expertise concerning the educational needs of children diagnosed with autism spectrum disorders;

(e) plaintiffs' attorneys' office has represented children with autism spectrum disorders in numerous states across the nation, and has consulted to families outside of the United States; and

(f)  to the extent that there is a "prevailing rate" in the Southern District of New York for sophisticated autism intervention cases, plaintiffs' attorneys' prevailing rates are reasonable and within the applicable standard.

---

[3] A redacted copy of the decision has been annexed hereto as Exhibit B.

18. Necessary duties involved with preparing S.S.'s cases for administrative due process hearings for the 2006-2007 and 2007-2008 school years included, but were not limited to: (a) corresponding with plaintiff and S.S.'s service providers; (b) holding numerous telephone conferences; (c) writing and filing impartial due process hearing requests; (d) reviewing and disclosing documentary information relevant to S.S.'s claims; (e) scheduling and preparing witnesses to testify at the hearings; and (f) developing effective case presentations for the 2006-2007 and 2007-2008 school years.

19. For all of the above efforts, plaintiffs should be awarded attorneys' fees, related costs and disbursements for this action and for the 2006-2007 and 2007-2008 school years in an amount to be set by this Court.

### PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, this Court should (a) fix and award plaintiffs their statutory attorneys' fees and related costs and disbursements from the IDEIA due process proceedings for the 2006-2007 and 2007-2008 school years in an amount to be set by the Court, (b) award plaintiffs the attorneys' fees and related costs and disbursements associated with this action in an amount to be set by the Court, and (c) award plaintiffs such other, different and further relief as this Court deems proper.

Dated: February 27, 2008
    New York, New York               Gary S. Mayerson (GSM 8413)
                                        Mayerson & Associates
                                        330 West 38th Street, Suite 600
                                        New York, New York 10018
                                        (212) 265-7200
                                        (212) 265-1735 (facsimile)

# FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case Number: | 105708 |
| Student's Name: | S███ S███ |
| Date of Birth: | August 16, 2001 |
| District: | 3 |
| Hearing Requested By: | Parent |
| Date of Hearing: | September 15, 2006<br>January 30, 2007<br>March 20, 2007 |
| Hearing Officer: | Amy L. Itzla, Esq. |

Case No.  105708

NAMES AND TITLES OF PERSONS WHO APPEARED SEPTEMBER 15, 2006

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| T██ D███ S███ | Mother | |
| Milton Villanueva | Chairperson Designee, CSE, Region 10 | Department of Education |

NAMES AND TITLES OF PERSONS WHO APPEARED JANUARY 30, 2007

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| T██ D███ S███ | Mother | |
| S██ S███ | Father | |
| Tina McCourt (via telephone) | Director Rebecca School | Parent |
| Nicole Kirkwood (via telephone) | Teacher, Rebecca School | Parent |
| Arthur Ellen | Chairperson Designee, CSE, Region 10 | Department of Education |
| Tiffany Civers (via telephone) | Psychologist | Department of Education |

NAMES AND TITLES OF PERSONS WHO APPEARED MARCH 20, 2007

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| T██ D███ S███ | Mother | |
| Debra Sales (via telephone) | Speech/Language Pathologist, Rebecca School | Parent |
| Mike Cohen (via telephone) | Director, Throwback Sports | Parent |
| Arthur Ellen | Chairperson Designee, CSE, Region 10 | Department of Education |
| Sarah Ginese (via telephone) | Chairperson Designee, Teacher, CSE, P.S. 166 | Department of Education |

Case No. 105708

---

## INTRODUCTION

I conducted an impartial hearing pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415(f)(1), regarding the educational program for S.S. for the 2006-2007 school year   The hearing was convened at the written request of S.S.'s parents (the "Parents"), by letter dated August 4, 2006, amended by letter dated September 5, 2006.  Hearings were held on September 15, 2006, January 30, 2007, and March 20, 2007, at the offices of the New York City Department of Education (the "DOE") located at 131 Livingston Street, Brooklyn, New York.  An Interim Order regarding S.S.'s pendency services and transportation was issued on September 15, 2006. A list of the individuals who appeared at the hearings and a list of the documents received into evidence are attached to this decision.

## BACKGROUND

S.S. is a 5 ½ -year-old girl classified with autism.  The DOE's Committee on Special Education ("CSE") met on April 20, 2006, to develop an Individualized Education Program ("IEP") for S.S. for the 2006-2007 school year.  (Parents Exhibit C) The Parents challenge the DOE's failure to properly develop an IEP and offer an appropriate program on procedural and substantive grounds.  Consequently, the Parents placed S.S. in a twelve-month private school program with a supplemental sports program on Friday afternoons.  The Parents are seeking reimbursement for the school and sports programs they have funded for the school year.

## POSITIONS OF THE PARTIES

## THE PARENTS' CASE

The Parents argue that there were procedural and substantive flaws in the CSE process, which constitute a failure to provide a free appropriate public education ("FAPE") to S.S.   Applying the Burlington/Carter criteria, discussed further below, the Parents maintain that the CSE did not recommend an appropriate program for S.S. and therefore, the Parents had no alternative but to create a program for S.S.  That program is appropriate for S.S.  Finally, there are no equitable considerations that would bar or limit the requested relief.

Case No. 105708

The Parents believe the IEP was not reasonably calculated to provide a meaningful and appropriate educational benefit. They believe the IEP is deficient on many levels. Procedurally, the flaws include the absence of a general education teacher at the CSE meeting, as required by statute. Substantively, the flaws include the failure to offer a twelve-month program, the failure to conduct a Functional Behavior Assessment ("FBA") and develop a Behavior Intervention Plan ("BIP"), the development of inadequate goals and objectives with no identified method of measurement, and the failure to provide parent training and counseling, a statutory requirement for children with autism. Of particular note, was the CSE's physical exclusion of the Parents from that portion of the meeting during which the goals and objectives were established.

Tina McCourt, Director of the Rebecca School, described the school. It is a private school, in its first year, which predominantly serves children on the autism spectrum. There are currently fifty students enrolled but the school has the capacity to educate two hundred students. (Tr. at 93-94)[1] She described the educational model used by the school and explained that every portion of the program emphasizes communication. (Tr. at 97) There are speech/language pathologists, occupational therapists, physical therapists, social workers and psychologists on staff. A team of therapists is assigned to each classroom to work with those students. (Tr. at 97-98, 103-104) The school has a sensory gym, a regular gymnasium, and an outdoor play area. (Tr. at 98) The school offers parent training, parent counseling, parent support groups and sibling groups. S.S.'s family participates in these programs. (Tr. at 118) Prior to S.S.'s enrollment, Ms. McCourt met with S.S. and her Parents, and a functional emotional development assessment was conducted. (Tr. at 104) S.S.'s class has seven students and is co-taught by two teachers with assistant teachers also present. (Tr. at 112) The classroom is comprised of children at a similar developmental level with similar language skills to S.S.. (Tr. at 110)

---

[1] Citations to the transcript of this proceeding will be abbreviated as "Tr." followed by the page number.

Case No. 105708

---

The school day ends early on Fridays for staff development. There is an after-school program on Friday afternoons, at the school, called Throwback Sports. It runs from 12:30 p.m. to 3:00 p.m. They offer sports, music and art activities. The program is not run by the school but it is held at the school and offered to its students. S.S. participates in the program. It is absolutely appropriate for her. (Tr. at 123-124)

S.S. is "definitely making progress in the classroom. She is scripting less. She is using more functional language. She's initiating communication between the other kids and the staff. She is able to do a back and forth flow, not always with language but with gestural cues. She is aware of her environment. She references the other children, talks about them, will look for them and she's made great gains as far as her pre-academic skills as far as spatial concepts and ability to sequence between events." (Tr. at 110) S.S. is making meaningful progress "across all domains, much better able to regulate herself." (Tr. at 111) This is an appropriate placement and program for her. (Tr. at 120)

The school's program is a twelve-month program with an annual tuition of seventy-two thousand five hundred dollars ($72,500). The Parents have already paid the full tuition for the 2006-2007 school year. (Tr. at 120, 125)

Nicole Kirkwood is one of S.S.'s head teachers at the Rebecca School. She confirmed that there are seven students in the class, two head teachers, and three teachers' assistants. (Tr. at 154) The two head teachers have Master's degrees, two of the assistant teachers are pursuing Master's degrees and the third assistant teacher has a Bachelor's degree. (Tr. at 154-155) Ms. Kirkwood described the weekly meeting during which the entire team, including therapists, counselors and teachers, meet to discuss all the children. (Tr. at 157) In addition, there is a staff development session every Friday afternoon. (Tr. at 157) Ms. Kirkwood has weekly contact with the Parents and parent-teacher conferences every two months. (Tr. at 158-159)

Ms. Kirkwood described the "ritualistic behaviors of autism" that S.S. presented with upon her enrollment in the school. At this point, her scripting has decreased, she is more regulated and she is interacting more with her peers. (Tr. at 164) Ms. Kirkwood stated that S.S. "has been making tremendous progress." (Tr. at 156) "We are targeting

Case No. 105708

all of her needs and I think she's growing. Everything that she has been doing is improving." (Tr. at 158) The school placement is an appropriate program for S.S. (Tr. at 158)

Michelle Colletti was S.S.'s occupational therapist at the Rebecca School from the beginning of September through November, when another therapist began seeing her. That therapist is no longer at the school. (Tr. at 173) Ms. Colletti provided occupational therapy to S.S. four times per week for thirty-minute individual sessions. (Tr. at 184) It was her recommendation that S.S. receive this frequency and duration of services. S.S. craves the proprioceptive and vestibular input. She worked on the swings and bouncing on balls. (Tr. at 174, 185) She needs a lot of work with her regulatory systems which requires as much time in the sensory gym as possible. (Tr. at 185) S.S. made meaningful progress in her sessions. (Tr. at 175)

Debra Sales is S.S.'s speech and language therapist at the Rebecca School. She works with the students from two classrooms. (Tr. at 200) S.S. receives therapy three times per week for thirty-minute individual sessions and one time per week for a thirty-minute group session. (Tr. at 203) Ms. Sales is also in the classroom several times a week to work with the students during a structured snack-time activity and also goes on field trips with the students. (Tr. at 203) S.S. has "obvious deficits in expressive language." When she started at the school, "she wasn't necessarily using words to communicate her wants and needs consistently and/or appropriately, as well as some pragmatic deficits in terms of social skills, play skills, and you know some receptive delays also due to some of those pragmatic things like attending, maintaining eye contact, issues like that." (Tr. at 202) She presented with some stereotypes like verbal scripting and jumping up and down. (Tr. at 202, 214) She is making meaningful progress with her speech and language therapy as documented in Ms. Sales' progress report dated March 8, 2007. (Tr. at 205, Parent's Exhibit FF)

Mike Cohen is the Director of the Throwback Sports program. It is offered at the Rebecca School, although it is not technically part of the school. It is a private program held on Friday afternoons, since the school day ends at 12:00 p.m. on Fridays. It is a

Case No. 105708

_____

camp-like program, in a recreational setting, held from 12:30 p.m. to 3:00 p.m.  S.S. has been a participant in the program since January.  (Tr. at 252, 256)  There are currently ten children, all students at the Rebecca School, in the program and ten staff members.  (Tr. at 253)  Mr. Cohen has two Master's degrees, one in movement sciences and one in special education.  He is certified by New York City and New York State in both physical education and special education.  (Tr. at 255)  The cost of the program is one hundred thirty dollars ($130) per session.  Therefore, a twelve-week session costs one thousand five hundred sixty dollars ($1,560)  The Parents have paid the full cost of the program.  (Tr. at 257)

S.S. is absolutely benefiting from the program.  She works on her physical skills, from throwing, to catching, to running.  She benefits from working as part of a team and in a group.  The program provides a natural, "real life," setting to demonstrate the skills they have learned.  It takes those skills "a step further."  (Tr. at 258-259)

T. D-S., S.S.'s mother, described the CSE meeting of April 20, 2006.  At the meeting, the Parents asked for parent training and counseling.  The CSE responded that they did not offer such services.  (Tr. at 269)  The Parents also asked for a twelve-month program.  However, they were told that a twelve-month program was only available for children in a 6:1:1 class.  The Parents believed that S.S. needed a twelve-month program based on her response to even a one-week school break.  (Tr. at 269-270)  According to Ms. D-S., the CSE team told the Parents that "they needed to work on the goals so they said we could either wait downstairs or we could go home and they would get them to us."  The Parents chose to wait downstairs.  (Tr. at 272)  There was no general education teacher present at the CSE meeting.  (Tr. at 275)

Ms. D-S. testified that scripting is one of S.S.'s most significant behavioral issues.  She scripts at home, at school, and in the community.  (Tr. at 273)  Following the testimony of Ms. Ginese, who would have been S.S.'s teacher at P.S. 166, Ms. D-S. was even more concerned with the CSE's recommended placement.  Ms. Ginese was unfamiliar with the term "scripting" and had no experience prior to this year with students classified with autism or PDD.  (Tr. at 274)

Case No. 105708

The CSE team did not identify a particular school placement for S.S. at the CSE meeting. (Tr. at 266-267)  T. D-S. visited P.S. 166 once that placement recommendation was made.  However, the program was not yet in existence at P.S. 166 so she could not see the actual classroom.  She still chose to visit the school so she could meet the parent coordinator and the assistant principal. (Tr. at 267-268)  The DOE made no alternative placement recommendations. (Tr. at 274)

By letter dated June 2, 2006, Ms. D-S. expressed her interest in visiting the proposed placement at P.S. 166 as soon as possible. (Parents Exhibit I)  By letter dated June 22, 2006, Ms. D-S. notified the DOE that she intended to seek an alternate placement and reimbursement from the DOE. (Parents Exhibit G) (Tr. at 277)

Ms. D-S. confirmed that she has seen positive changes in S.S. during this school year. (Tr. at 280)  Ms. D-S. also confirmed that all services, including speech/language therapy, occupational therapy, counseling, and parent training and counseling, for a twelve-month school year, are all included in the annual tuition for the Rebecca School. (Tr. at 287)

## THE DISTRICT'S CASE

In addressing the first prong of the Burlington/Carter analysis, whether the DOE's recommended program was appropriate, the DOE has argued that its placement recommendation would have provided S.S. with a program in the least restrictive environment.  The DOE did not present a defense to the Parents' challenges regarding the absence of a general education teacher at the CSE meeting, the exclusion of the Parents from that portion of the meeting during which goals and objectives were established, and the failure to provide parent training and counseling.

As for the second prong of the analysis, the DOE did not offer any testimony, evidence, or even argument, challenging the appropriateness of the program privately arranged by the Parents.

Tiffany Civers is a school psychologist with the DOE.  She served as the psychologist and district representative at the CSE meeting of April 20, 2006. (Tr. at 25, 35)  There were no participants present at the meeting, other than the Parents, who had

Case No.  105708

ever met S.S.  Ms. Civers could not recall whether the CSE team called Dr. Dub during the meeting.  She had created the psychoeducational report considered by the CSE.  (Tr. at 77)  She explained that the recommendation contained in the IEP, for a special class in a community school with a 12:1:1 ratio, was based on a review of clinical information provided by the Parents and progress reports from S.S.'s school.  (Tr. at 30)  S.S. participated in a mainstream environment in the 2005-2006 school year at Calhoun.  She "had a lot of strengths and we thought that because she has shown the strengths in a mainstream environment we felt that S.S. would benefit to stay in the mainstream environment.  We felt to place S.S. in a small environment may hinder her academic growth."  (Tr. at 30-31)  The CSE team felt that "she would benefit from interaction among non-disabled peers during non-academic periods, such as lunch and assemblies." (Tr. at 44)

Ms. Civers explained the inconsistencies in the IEP.  She described the error in S.S.'s gender, as male instead of female, as a "typo."  (Tr. at 48)  The duration of services on the IEP states "one year."  However, Ms. Civers stated that means one school year, not calendar year.  Although the IEP seems to specify that the one-year period is from 9/06 through 9/07, one calendar year, Ms. Civers stated that the period noted would exclude the summer.  She described this as "an error."  (Tr. at 58)  When asked if this portion of the IEP was confusing, Ms. Civers responded, "Yes, I can grant you that."  (Tr. at 59)  To add to the confusion, the IEP indicates that a twelve-month school year is not recommended.  (Tr. at 33-34)  Ms. Civers explained that it is the practice not to recommend a twelve-month program for a child placed in a special class in a community school.  A twelve-month program is only available to students within the District 75 setting.  (Tr. at 54-55)

Ms. Civers explained that there was no general education teacher present at the CSE meeting because "we did not consider general education as a program for S.S."  (Tr. at 36)  However, when asked why there was no general education teacher present, in light of the fact that S.S. attended a mainstream school in the prior school year, Ms. Civers responded, "Not sure."  (Tr. at 52)  Ms. Civers assumed, erroneously, that S.S.'s prior

Case No. 105708

placement was in a full-day program. The program was actually three hours per day. Ms. Civers was asked, "So the answers that you gave about what you thought it meant that she attended Calhoun School and what it meant for the next year, this all depended on you being accurate that she was there for a full-day program, am I right?" Her response was "Yes." (Tr. at 59-60)

Ms. Civers also explained that there are no methods of measurement indicated on the IEP because the teacher would determine which method of measurement to apply to a particular goal or objective. (Tr. at 42) The IEP goals are "more general goals" but "once she's in the classroom the teacher would be able to go in and really develop goals that are more specific to S.S." (Tr. at 44)

Ms. Civers could not state what document the CSE team referred to in determining the level of speech/language therapy recommended for S.S. or why the team did not adopt the recommendations contained in the psychoeducational report. (DOE Exhibit 4)

Ms. Civers testified that she has never heard of any requirement to offer parent training and counseling to parents of children classified with autism. Therefore, it was not considered by the CSE team. (Tr. at 71-72)

Ms. Civers agreed that the behaviors described in the psychoeducational report "absolutely" interfere with S.S.'s learning process. However, the CSE team did not recommend an FBA because they believed the behaviors could be addressed in a special class in a community school. The special education teacher and counselor could address the behavior issues. (Tr. at 73-74) It is violent or aggressive behaviors, those that could harm the child or others, that would trigger consideration of an FBA. (Tr. at 75)

Sarah Ginese is the teacher of the class at P.S. 166 that the CSE recommended for S.S. There are twelve students in her class, with one teacher, a paraprofessional, and a morning assistant. There is also a one-to-one paraprofessional in the room throughout the day. (Tr. at 227, 238) There is speech/language therapy, occupational therapy and counseling available at the school. (Tr. at 229) Two of the twelve students in her class have IEP classifications of Pervasive Developmental Disorder, nine are classified as

Case No. 105708

speech and language impaired, and one is classified as learning disabled. (Tr. at 248)[2] There are no students in the class with the classification of autism. (Tr. at 230) This is a ten-month program. (Tr. at 235) Ms. Ginese has not had any special training in autism other than taking some classes during her master's program. (Tr. at 236) She testified that she is familiar with certain concepts related to autism. She was unfamiliar with the terms "autoclitic response" and "scripting." (Tr. at 236, 251) In her three years as a special education teacher, she has never taught a child classified as autistic. She taught one student with Asperger's, and now teaches two students classified with "PDD." (Tr. at 249) She had never heard about any requirement to provide parent training and counseling for parents of children with autism. (Tr. at 243) Ms. Ginese agreed that it would have been helpful to have the CSE identify the method of measurement to be used to assess the goals and objectives on the IEP. (Tr. at 245-246) Ms. Ginese has never met S.S. and first saw her IEP in preparation for this proceeding. (Tr. at 233)

Ms. Ginese confirmed that she was hired at the end of June, 2006. She created her classroom in August, 2006. When the Parents visited the school in June, 2006, there was no class in existence for them to observe or visit. (Tr. at 246-247)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

There are several issues raised in this proceeding: the procedural defects in the IEP and in the IEP development process, the substantive defects in the content of the IEP, the inappropriateness of the recommended program, and reimbursement for the cost of the program secured by the Parents.

"The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." (Schaffer v. Weast, 126 S.Ct. 528, 537 [2005]). Accordingly, the Parents, as the party seeking relief, have the burden of persuasion to demonstrate that the DOE failed to offer S.S. a FAPE for the 2006-2007 school year.

The purpose behind the IDEA (20 U.S.C. §§ 1400 - 1487) is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A];

---

[2] There are several inconsistencies between Ms. Ginese's testimony and the class roster. There are also inconsistencies on the class roster itself. (DOE Exhibit 1)

Case No.  105708

Schaffer at 528 [2005]).[3]  A FAPE includes special education and related services
designed to meet the student's unique needs, provided in conformity with a
comprehensive written individualized education program (IEP) (20 U.S.C. § 1401[8][D];
34 C.F.R. § 300.13; see 20 U.S.C. § 1414[d]).  A board of education may be required to
reimburse parents for their expenditures for private educational services, obtained for a
student by his or her parent, if the services offered by the board of education were
inadequate or inappropriate, the services selected by the parent were appropriate, and
equitable considerations support the parent's claim (Sch. Comm. of Burlington v. Dep't of
Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7
[1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]).  In
Burlington, the Court found that Congress intended retroactive reimbursement to parents,
by school officials, as an available remedy in a proper case under the IDEA
(id.).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should
have paid all along, and would have borne in the first instance had it developed a proper
IEP" (Burlington, at 370-71; see Application of the Bd. of Educ., Appeal No. 05-073).

A FAPE is offered to a student, when the board of education: (a) complied with
the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE
through the IDEA's procedures is reasonably calculated to enable the student to receive
educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 207 [1982]).  While
school districts are required to comply with all IDEA procedures, not all procedural errors
render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346
F.3d 377, 381 [2d Cir. 2003]).  If a procedural violation has occurred, relief is warranted
only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224
F.3d 60, 69 [2d Cir. 2000]).  A denial of a FAPE occurs when procedural inadequacies

---

[3]The term "free appropriate public education" means special education and related services that:
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d)
of this title.
    20 U.S.C. § 1401(8).

Case No. 105708

either result in a loss of educational opportunity for the student, or seriously infringe on the parents' opportunity to participate in the IEP formulation process (see Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 [S.D.N.Y. 2005]; W.A. v. Pascarella, 153 F. Supp. 2d 144, 153 [D. Conn. 2001]; Briere v. Fair Haven Grade Sch. Dist., 948 F. Supp. 1242, 1255 [D. Vt. 1996]), or compromise the development of an appropriate IEP in a way that deprives the student of educational benefits under that IEP (see Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158 [S.D.N.Y. 2002]).  The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.550[b]; 8 NYCRR 200.6[a][1]).  In evaluating the substantive program developed by the CSE, the Second Circuit has observed that "for an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce progress, not regression" (Weixel v. Bd. of Educ., 287 F.3d 138, 151 [2d Cir. 2002], quoting M.S. v. Bd. of Educ., 231 F.3d 96, 103 [2d Cir. 2000][internal quotation omitted]).  This progress, however, must be meaningful; i.e., more than mere trivial advancement (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]). The IDEA, however, does not require school districts to develop IEP's that maximize the potential of a student with a disability (Rowley, 458 U.S. at 197 n.21, 199; see Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the child's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). Federal regulation requires that an IEP include a statement of the child's present levels of educational performance, including a description of how the child's disability affects his or her progress in the general curriculum (34 C.F.R. § 300.347[a][1]; see also 8 NYCRR 200.4[d][2][i]).  School districts may use a

variety of assessment techniques such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination thereof, to determine the child's present levels of performance and areas of need (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Question 1).

An IEP must include a statement of the special education and related services, and supplementary aids and services, to be provided to, or on behalf of, the student, as well as a statement of the program modifications or supports for school personnel that will be provided to the student (34 C.F.R. § 300.347[a][3]; see 8 NYCRR 200.4[d][2][iv]). Such education, services and aids must be sufficient to allow the student to advance appropriately toward attaining his or her annual goals (34 C.F.R. § 300.347[a][3][i]; see 8 NYCRR 200.4[d][2][iv][a]). "[S]pecial education and related services must be provided in the least restrictive setting consistent with a [student's] needs" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 [2d Cir. 1998]).

There were several issues raised regarding the procedural and substantive flaws in the IEP. These issues, which include, but are not limited to, the absence of a general education teacher, the failure to consider an functional behavior assessment to create a behavior intervention plan, the failure to recommend a twelve-month school year, the lack of objective measurement methods to assess attainment of goals and objectives, an inappropriate placement recommendation, and an insufficient level of related services, will not all be addressed in detail herein. It is unnecessary to analyze the various deficiencies in the IEP since the combination of only a few of these deficiencies render the IEP invalid.

The IEP is the "modus operandi" of the IDEA (Burlington Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 368 [1985]). Under both state and federal law, an IEP is specifically defined as a "written statement" that addresses the educational needs of a child with a disability (20 U.S.C. § 1401(11); 34 C.F.R. § 300.340[a]; 8 NYCRR 200.1[y]). The IDEA and its corresponding regulations mandate that at the beginning of each school year, a school district must have an IEP in place for each child with a disability that resides within its jurisdiction (20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.342[a]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 194 [2d Cir. 2005]). The IEP must be in effect before

Case No. 105708

special education and related services are provided (34 C.F.R. § 300.342[b][1][i]). The school district must provide a copy of the IEP to the parent, without the need for a request (34 C.F.R. § 300.345[f]; 64 Fed. Reg. 12587 [comment]; 8 NYCRR 200.4[e][3]). In addition, federal regulations require that the child's IEP must be accessible to each regular education teacher, special education teacher, and all other service providers who are responsible for its implementation (34 C.F.R. § 300.342[b][2]).

The Supreme Court has defined the IEP as the centerpiece of the IDEA's educational delivery system (Honig v Doe, 484 US 305, 311 [1988]). "The IEP is the central mechanism by which public schools ensure that their disabled students receive a free appropriate public education" (Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 482 [2d Cir. 2002]). The IEP is not just a description of the services to be provided to a child; it also must include "measurable, intermediate steps (short-term objectives) or major milestones (benchmarks) that will enable parents, students, and educators to monitor progress during the year, and, if appropriate, to revise the IEP consistent with the student's instructional needs" (34 C.F.R. Part 300, Appendix A, Question 1 [emphasis added]). Hence, service providers must refer to the IEP continuously throughout the year in order to gauge its effectiveness in meeting short term goals and benchmarks and make appropriate revisions where necessary (see, id.). An IEP must include measurable annual goals, including benchmarks or short-term objectives, related to meeting the student's needs arising from his or her disability, to enable the student to be involved in and progress in the general curriculum, and meeting the student's other educational needs arising from the disability (34 C.F.R. § 300.347[a][2]; see 8 NYCRR 200.4[d][2][iii]). In addition, an IEP must describe how the student's progress towards the annual goals will be measured and how the student's parents will be regularly informed of such progress (34 C.F.R. § 300.347[a][7]; 8 NYCRR 200.4[d][2][iii]). S.S.'s IEP did not designate any method of measurement, despite the coding system contained in the IEP which offers more than eight possible methods, for any of the annual goals. Since the CSE team failed to include the method of measurement intended to be used to assess progress towards the goals, the goals were not objectively measurable.

Case No. 105708

_____

The IDEA and its implementing regulations require that the CSE include "at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment)" (20 U.S.C. § 1414[d][1][B][ii]; see 34 C.F.R. § 3 00.344[a][2]; see also 8 NYCRR 200.3[a][1][ii]). In its official interpretation of the regulations, the United States Department of Education explains that the regular education teacher member "should be a teacher who is, or may be, responsible for implementing a portion of the IEP, so that the teacher can participate in discussions about how best to teach the child" (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 26). The regular education teacher member "shall, to the extent appropriate, participate in the development of the IEP of the child, including the determination of appropriate behavioral interventions and strategies and the determination of supplementary aids and services, program modifications, and support for school personnel" (20 U.S.C. § 1414[d][3][C]; see 34 C.F.R. § 300.346[d]; 8 NYCRR 200.3[d]). The regular education teacher must also "participate in discussions and decisions about how to modify the general curriculum in the regular classroom to ensure the child's involvement and progress in the general curriculum and participation in the regular education environment" (34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Question 24), and participate in any review and revision of the IEP (20 U.S.C. § 1414[d][4][B]; 34 C.F.R. § 300.346[d]; 8 NYCRR 200.3[d]).

The CSE meeting was held to plan S.S.'s transition from preschool to kindergarten. Given that she had participated in a mainstream preschool program, which was known to the CSE, a regular education teacher was a required member of the CSE. The absence of such a teacher compromised the development of an appropriate IEP for S.S. for the 2006-2007 school year, and it potentially deprived her of educational benefits which could have resulted in a denial of a FAPE (see, Arlington Cent. Sch. Dist. v. D.K., 2002 WL 31521158 [S.D.N.Y. 2002]; Application of a Child with a Disability, Appeal No. 02-080; Application of a Child with a Disability, Appeal No. 01-105; Application of a Child with a Disability, Appeal No. 01-083).

Case No. 105708

The goals and objectives, as they are written, denied S.S. educational benefit and constitute a denial of a FAPE to S.S. There were no methods of measurement selected by the CSE. Most offensive was the CSE's exclusion of the Parents from that portion of the CSE meeting during which the goals and objectives were developed. The CSE's action seriously infringed on the Parents' opportunity to participate in the IEP development.

The IEP was substantively defective, as it did not provide for parent training. State regulation requires that educational programs for children with autism must include parent counseling and training for the purpose of enabling parents to perform appropriate follow-up intervention activities at home. (8 NYCRR Section 200.13[d]) Parent training and counseling means "assisting parents in understanding the special needs of their child; providing information to parents about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program. (8 NYCRR Section 200.1 [kk]) Parent training is a key component of the educational program for an autistic child. It allows and facilitates the generalization of acquired skills from the school to the home and enables parents to address behavioral, safety and learning issues that they may have with the child in the home and the community. The Parents clearly wanted to receive parent training, and the record clearly demonstrates the importance of effective communication between home and school for generalization to occur.

The failure of the CSE to include parent training as part of .S.S's educational program renders the program inappropriate and constitutes a substantive denial of a FAPE.

Based upon the combined nature and number of the above-mentioned inadequacies, without even addressing the remaining deficiencies, I find that the record demonstrates that the IEP was not reasonably calculated to enable S.S. to receive educational benefit and she was not offered a FAPE for the 2006-2007 school year. In addition to the flaws already addressed, the recommended placement was wholly inappropriate for S.S. The testimony, described above, established that S.S. required an educational placement with enough support in the classroom to allow her to make

Case No. 105708

educational gains and meaningful progress. The staffing level and the experience of the staff assigned to the DOE's proposed class would be utterly insufficient to match the needs of S.S. Every aspect of the proposed class, from the staffing ratio, to the teacher's inexperience with autistic children, to the class composition (students classified primarily as speech and language impaired), to the absence of any system to address S.S.'s behaviors, to the ten-month school year limitation, is inappropriate for S.S. The Parents have established that the DOE failed to offer S.S. an appropriate program. Therefore, I find that the Parents have prevailed with respect to the first criterion for an award of reimbursement under the Burlington and Carter decisions.

The Parents have the burden of establishing the appropriateness of the services they have arranged for S.S. (Application of a Child with a Disability, Appeal No. 95-57; Application of a Child with a Disability, Appeal No. 02-093) In order to meet that burden, they must demonstrate that the services provided offer an educational program which meets the student's special education needs. (Burlington, 471 U.S. at 370; Application of a Child with a Disability, Appeal No. 94-29)

I find that the program implemented by the Parents is appropriate to meet S.S.'s special education needs for the 2006-2007 school year. It has been persuasively established by the Parents, as the testimony cited herein supports, and it is undisputed by the DOE, that the twelve-month program at the Rebecca School and the supplementary Throwback Sports program are appropriate.

I therefore find that the Parents have prevailed with respect to the second criterion for reimbursement under the Burlington and Carter decisions.

The final criterion for an award of reimbursement is whether the Parents' claim is supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; M. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]; see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"]). Such considerations "include the parties' compliance or noncompliance with state and federal

Case No. 105708

_____

regulations pending review, the reasonableness of the parties' positions, and like matters" (Wolfe v. Taconic Hills Cent. Sch. Dist., 167 F. Supp. 2d 530, 533 [N.D.N.Y. 2001], citing Town of Burlington v. Dep't of Educ., 736 F.2d at 773, 801-02 [1st Cir. 1984], aff'd, 471 U.S. 359 [1985]). With respect to equitable considerations, a parent may be denied reimbursement upon a finding of a failure to cooperate with the CSE in the development of an IEP or if the parent's conduct precluded the CSE's ability to develop an appropriate IEP (Warren G. v. Cumberland Co. Sch. Dist., 190 F.3d 80, 86 [3rd Cir. 1999]; see Application of the Bd. of Educ., Appeal No. 04-102; Application of the Bd. of Educ., Appeal No. 04-026). In the absence of evidence demonstrating that a parent failed to cooperate in the development of the IEP or otherwise engaged in conduct that precluded the development of an appropriate IEP, or failed to give proper notice, equitable considerations generally support a claim of reimbursement (Application of a Child with a Disability, Appeal No. 04-049).

The Parents have cooperated with the CSE. They attended the CSE meeting, which included their inappropriate exclusion from a portion of the meeting, they provided evaluative materials to the CSE, and they visited the proposed school despite the nonexistence of the proposed class. The Parents timely notified the DOE of their intent to arrange an alternate program for S.S. and seek reimbursement from the DOE. There was no allegation that the tuition charged by the Rebecca School or the fee charged for the Throwback Sports program is excessive or unreasonable. There are no factors present which serve to deny or diminish reimbursement on this basis.

I find that equitable factors support the Parents' claim for reimbursement. The Parents have met the third criterion for reimbursement under the Burlington and Carter decisions.

## ORDER

It is therefore ordered that:

1.  The DOE shall reimburse the Parents for tuition payments made to the Rebecca School for the twelve-month 2006-2007 school year, from September 2006 through and including August 2007, upon submission of proof of

Case No. 105708

payment by the Parents. Tuition for the 2006-2007 school year is seventy-two thousand five hundred dollars ($72,500).

2. The DOE shall reimburse the Parents for tuition payments made to the Throwback Sports program for the twelve-month 2006- 2007 school year, from September 2006 through and including August 2007, upon submission of proof of payment by the Parents. Tuition for each twelve-week session during the 2006-2007 school year is one thousand five hundred sixty dollars ($1,560).

3. The Interim Order issued September 15, 2006, reflected the parties' agreement that the transportation services provided by the DOE to S.S. must be in compliance with the medical recommendation of S.S.'s physician. The medical documentation requires that, based on S.S.'s age and diagnosis on the Autism Spectrum, "her bus travel to and from school be limited to 50 minutes each way." (Parent's Exhibit E) The DOE shall continue to consistently implement the transportation mandate as defined by S.S.'s physician. S.S.'s travel time, to and from school, must be limited to fifty minutes each way.

Dated: April 26, 2007

AMY LYNNE ITZLA, ESQ.
Impartial Hearing Officer

ALI:nn

Case No.  105708

---

## DOCUMENTS ENTERED INTO RECORD SEPTEMBER 15, 2007

A.                    Amended Request for Hearing, 9/5/06, 4 pp.                    Parent

B.                    Request for Hearing, 8/14/06, 3 pp.                           Parent

C.                    IEP, 4/26/06, 14 pp.                                          Parent

D.                    IEP, 5/18/05, 14 pp.                                          Parent

E.                    Letter to Office of Pupil Transportation and Letter from
                      S.S.'s Physician                                             Parent

## DOCUMENTATION ENTERED INTO THE RECORD JANUARY 30, 2007

### Parents' Exhibits

| Exhibit | Date | Description Pages | |
|---|---|---|---|
| P-A | September 5, 2006 | Request for Due Process – Amended and fax confirmation | 04 Pages |
| P-B | August 14, 2006 | Request for Due Process | 03 Pages |
| P-C | April 26, 2006 | New York City Board of Education – IEP | 14 Pages |
| P-D | May 18, 2005 | New York City Board of Education – IEP | 14 Pages |
| P-E | September 8, 2006 | Letter to Office of Pupil Transportation and Dr. Adrianne Goldberg's recommendation | 02 Pages |
| P-F | August 1, 2006 | S.E.I.T. Student Progress Report By:  Yehosheba Carter, B.A. | 01 Page |
| P-G | June 22, 2006 | Letter and facsimile confirmation From Parent to Ms. Sprecher | 04 Pages |
| P-H | June 15, 2006 | S.E.I.T. Student Progress Report By:  Yehosheba Carter, B.A. | 01 Pages |

Case No. 105708

| | | | |
|---|---|---|---|
| P-I | June 2, 2006 | Letter and facsimile confirmation<br>From Parent to Ms. Sprecher | 03 Pages |
| P-J | May 9, 2006 | C-14 Notice of Recommended<br>Deferred Placement<br>and facsimile confirmation | 03 Pages |
| P-K | Jan 6, 11, 16, 18<br>Jan 20, 25, and<br>Feb 1, 2006 | Psychoeducation Evaluation<br>By: Elyse Dub, Ph.D., NCSP | 13 Pages |
| P-L | January 31, 2006 | Speech and Language Progress Report<br>By: Tricia A. Brown, M.S., CCC/SLP | 02 Pages |
| P-M | January 13, 2006 | Related Service Student Progress Report<br>By: Karen Hennigan, OTR/L | 01 Page |
| P-N | January 10, 2006 | Progress Report<br>By: Hehosheba Carter, B.A., S.E.I.T. | 03 Pages |
| P-O | 2006-2007 | Rebecca School – Student Calendar | 01 Page |
| P-P | 2006-2007 | Rebecca School Enrollment Contract,<br>Invoices, and proof of payment | 05 Pages |
| P-Q | | Throwback Sports Report:<br>Music Therapy sessions | 01 Page |
| P-R | | Throwback Sports Program Information | 02 Pages |
| P-S | | Throwback Sports application with proof of<br>payment attached | 02 Pages |
| P-T | October 12, 2006 | Proofs of payment for the Rebecca School | 03 Pages |
| P-U | | Rebecca School Information | 04 Pages |
| P-V | | Student Schedule | 02 Pages |
| P-W | | School Attendance Records<br>September 13, 2006-January 18, 2007 | 01 Page |

Case No.  105708

---

**DOE's Exhibits**

| **Exhibit Pages** | **Date** | **Description** | |
|---|---|---|---|
| 1 | January 22, 2007 | Class Roster | 02 Pages |
| 2 | May 26, 2006 | Final Notice of Recommendation | 01 Page |
| 3 | April 20, 2006 | IEP | 14 Pages |
| 4 | February 1, 2006 | Psychoeducational Evaluation | 13 Pages |


## DOCUMENTATION ENTERED INTO THE RECORD MARCH 20, 2007

**Parents' Exhibits**

| **Exhibit** | **Date** | **Description Pages** | |
|---|---|---|---|
| P-X | February 2007 | Progress Report<br>By:  Megan Brown, Ph.D. | 02 Pages |
| P-Y | November 14, 2006 | Progress Report<br>By:  Classroom Co-Head Teacher | 03 Pages |
| P-Z | November 14, 2006 | Speech and Language Progress Report<br>By:  Debra L. Sales, M.S., CCC-SLP | 02 Pages |
| P-AA | November 14, 2006 | Occupational Therapy Summary<br>By:  Michelle Colletti, OTR/L | 02 Pages |
| P-BB | November 14, 2006 | Understanding Music Therapy<br>Program Information | 02 Pages |
| P-CC | November 10, 2006 | Progress Report<br>By:  Megan Brown, Ph.D. | 01 Page |
| P-DD | March 14, 2007 | Progress Report<br>By:  Elizabeth Guzman, M.S. | 03 Pages |

Case No.  105708

| | | | |
|---|---|---|---|
| P-EE | March 12, 2007 | DIR/Floortime Therapy Spring Progress Report<br>By:  Megan Brown, Ph.D. | 02 Pages |
| P-FF | March 8, 2007 | Speech and Language Progress Report<br>By:  Debra L. Sales, M.S., CCC-SLP | 02 Pages |
| P-GG | March 8, 2007 | Occupational Therapy Progress Report<br>By:  Victoria A. Ritvo, OTR/L | 02 Pages |
| P-HH | March 2007 | Adapted Physical Education<br>By:  Patrick J. Papaccio, M.S., CAPE | 01 Page |

# FINDINGS OF FACT AND DECISION

Case Number:          112193

Student's Name:       S███ S███

Date of Birth:        August 16, 2001

District:             2

Hearing Requested By: Parent

Date of Hearing:      October 10, 2007
                      November 7, 2007

Hearing Officer:      Judith T. Kramer, Esq.

Hearing Officer's Findings of Fact and Decision                                    1

Case No.   112193

_____

## NAMES AND TITLES OF PERSONS WHO APPEARED OCTOBER 10, 2007

| | | |
|---|---|---|
| Gary Mayerson | Attorney | Parent |
| Ariella Garafolo-Berger | Chairperson Designee, CSE 9 | Department of Education |


## NAMES AND TITLES OF PERSONS WHO APPEARED NOVEMBER 7, 2007

| | | |
|---|---|---|
| Randi Rothberg | Attorney | Parent |
| T█████████ S██████ | Parent | |
| Tina McCourt | Program Director, Rebecca School | Parent |
| Debra Sales (Via Telephone) | Speech Therapist | Parent |
| Rebecca Star (Via Telephone) | Head Teacher | Parent |
| Michael Cohen (Via Telephone) | Throwback Sports Director | Parent |
| Victoria Ritvo (Via Telephone) | Occupational Therapist | Parent |
| Meghan Brown (Via Telephone) | Psychologist | Parent |
| Ariella Garafolo-Berger | Chairperson Designee, CSE 9 | Department of Education |

Hearing Officer's Findings of Fact and Decision                    2

Case No.  112193

---

## INTRODUCTION

On November 7, 2007 an impartial hearing was commenced pursuant to the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. 1415 regarding a parental request for tuition reimbursement for S.S. ("the child") for the 2007-2008 school year at the Rebecca School as well as for her participation in Throwback Sports. The hearing was held at the Impartial Hearing Office of the Board of Education of the City of New York located at 131 Livingston Street, Brooklyn, New York.

A list of exhibits that were admitted into evidence is attached to this decision.

## BACKGROUND

The student is 6 years old and classified as autistic. (Parent's Exhibit D) The Department of Education (DOE) stipulated at the hearing that it failed to provide the child with a free appropriate public education (FAPE) for the 2007-2008 school year from July 1st through June 2008.

## THE PARENTS' POSITION

The parent contends that the child was denied a FAPE because she was not provided with an appropriate placement or with appropriate related services for the 2007-2008 school year. The parent seeks reimbursement for the 2007-2008 school year through the summer of 2008. They contend that they are entitled to reimbursement for the cost of the Rebecca School because it is a twelve-month program running through the summer of 2008. At the time of the hearing, they were also seeking reimbursement for the child's participation in an after school program called Throwback Sports but that request has been withdrawn. They further contend that the Rebecca School is an appropriate placement and that the equities are in their favor.

## THE DOE'S POSITION

The DOE concedes that it failed to offer a FAPE for the 2007-2008 school year. It did not stipulate that such failure extends through the summer of 2008. It contends that it is premature to consider whether a FAPE will be provided to the child during the summer of 2008 because the school year ends in June 2008.

Hearing Officer's Findings of Fact and Decision                                    3

Case No.  112193

_____

## THE EVIDENCE PRESENTED

The student is 6 years old and is classified as autistic. (Parent's Ex. D) The child has been attending the Rebecca School since September 2006. Prior to the child's placement there, the parent cooperated with the DOE. She attended all CSE meetings and obtained the proper evaluations for the child. When the DOE failed to provide the child with a FAPE, the parent placed the child at the Rebecca School and enrolled her at the Rebecca School. She signed a contract and gave a $10,000 deposit to the Rebecca School but was willing to forfeit the deposit if the DOE found a placement.  No DOE placement was offered. (Parent's Ex.P., T. 179, 192)

The parent has been involved at the Rebecca School.  She has been participating in some of the parent training there as well as the parent support groups. She testified that since attending the Rebecca School, her child has made as lot of progress in academic performance as well as her ability to be more independent in her daily living skills. (T. 187 )

She believes that the child needs a twelve-month program because she has seen regression in the child's skills when she is way from school for even a week. (T.192-193)

The child's OT provider testified that she has worked with the child three times a week in pullout sessions as well as in the classroom once a day when she works with the staff and educates them as to the OT therapies which calm the child e.g. brushing, obstacle courses, and other parts of the sensory diet. (T. 160-164)  She speaks to the child's classroom teacher regularly with regard to the handwriting program. She has also assessed the child's handwriting readiness and has determined that the child can hold a pencil and can trace the letters of the alphabet. (T. 167)  She also testified that the child has made meaningful gains this year in self-regulation and in letting the OT introduce activities, which she previously would not allow. (T. 168) She opined that the child requires a twelve- month program and the Rebecca School is an appropriate placement for the child. (T.171)

The child's speech and language provider who is a licensed speech pathologist at the Rebecca School has worked with the child since September 2006. (T. 88)  She

Hearing Officer's Findings of Fact and Decision                                    4

Case No.  112193

---

testified that the child had deficits in spontaneously use of language; in play skills and engaging in interaction. She testified that the child often engaged in scripting behavior but that this year such behavior has decreased and that the child is using language for more functional purposes. (T.88-89)

She sees the child twice a week for 30 minutes 1:1 and once a week 2: 1 for thirty minutes. She also works in the classroom with the child and consults with her teacher as the OT. (T. 89-90) She believes that the child's play skills have progressed this year and has made gains in working with her peers and following simple directions. (T.94) She is constantly assessing the child and keeps session notes and issues progress reports twice a year in addition to performing a formal assessment of the child, which was administered in May 2007. (T.102)  Such assessments have shown that the child has been making steady progress, but needs a twelve-month program. (T. 103,105)  She testified that the Rebecca School is an appropriate placement. (T. 105)

The child's classroom teacher also testified that the child is doing very well in her classroom this year. (T.127) She testified that the child's academic skills were her greatest strength. (T. 115) She is working on decoding words and handwriting as well as math problems using numbers from one to ten. (T. 120) The child can write uppercase letters. Id. She also testified that the child has made gains in her social and emotional skills this year. She is making great gains in problem solving. She can answer "who" and "what" questions. (Parent's Ex G.) She has an ability to become regulated when other students are deregulated. She is now aware of other students in the class and with facilitation, she can engage with parallel play with another child. (T.121-122)

She testified that the child needs a twelve-month program and that the Rebecca School is an appropriate placement.(T.129)

The school psychologist at the Rebecca School also testified at the hearing. She has a Ph.D. in clinical psychology and has been working with the child since September 2006. She has observed the child in the classroom, in her music room, in OT and speech and language therapy. (T. ) She testified that the child is not aggressive however, she testified that when the child gets over stimulated, she gets emotionally deregulated. She

cannot modulate her feelings—she is either happy or sad, there is no in between. (T. 144) She testified that the child becomes most confused and deregulated during transitions and feed off of other children's emotions e.g. if another child is crying, she will cry. The child is heavily prompt dependent and cannot participate in group activities—she needs 1:1 or 1:2. She testified that the child has made progress since last year and is now interested in playing with her peers. (T. 142) Her largest gains have been made in the child's ability to focus and the attend to one or two activities at a time; her ability to have play date since her social skills are growing and developing and she is scripting less, using more spontaneous language and working on symbolic thinking. (T.148, 150-151)

She testified that the child requires a twelve month program and that the Rebecca School is an appropriate program for the child. (T. 153-154)

The DOE did not present any evidence nor did it cross examine any the parent's witnesses.

The tuition for the Rebecca school is $75,100 for the 2007-2009 school year, which extends through August 2008. (T. 69)

**CONCLUSIONS OF LAW**

Both the IDEA; state law and regulations require that each and every disabled child be provided a FAPE in the LRE appropriate to meet their individual needs. (emphasis added) 20 U.S.C. § 1412 (a)(1)(A); 1412 (a)(5)(A); 34 CFR § 300.550(b); 8 NYCRR § 200.4 (c)(4); 8 NYCRR § 200.6 (a)(1). The DOE bears the burden of persuasion to establish that it offered the student a FAPE.

Here, the DOE concedes that it failed to provide the child with a FAPE however, it does not concede that it is not yet responsible for providing the child with a FAPE for the summer of 2008 because the 2007-2008 school year ends in June 2007. The parent must show that its unilateral placement of the child at the Rebecca School is appropriate and that the child requires a twelve-month placement.

The parent has met her burden as to both of these issues. All of the testimony, none of which was refuted or even questioned by the DOE, shows that the child is making steady gains academically, socially and emotionally at the Rebecca school through her

Hearing Officer's Findings of Fact and Decision                                    6

Case No.  112193

_____

regular participation with all of her therapists and her teacher. All of these professionals testified that this year the child is more focused, is starting to recognize her peers, is scripting less, is self-regulating more, is beginning to be able to pretend play and is excelling academically. Moreover, each of these professionals testified that the Rebecca school was an appropriate placement for the child. In addition, the unrefuted evidence shows that the child requires a twelve-month program. The professionals testified that the child needs constant prompting and attention in order to continue to make progress and not lose the skills that she has acquired. The child's parent testified that even after a week away from the Rebecca School, the child reverts back to her scripting and withdrawn behavior. The Rebecca school offers a twelve-month program and its tuition cost is based upon a twelve- month program. It is appropriate for the child to participate in a twelve-month at the Rebecca School.

**ORDERED** that:

1)  the parents' request for tuition reimbursement for the child to attend the 2007-2008 school year at the Rebecca School is granted.

2)  DOE shall reimburse the parent in the amount of $75,100 which is the cost of the tuition at the Rebecca School for its twelve- month program running from September 2007 through August 2008 upon the parents' presentation of proof that the tuition has been paid in full to the Rebecca School.

Dated: October 29, 2007

*Judith T. Kramer*

JUDITH T. KRAMER, ESQ.
Impartial Hearing Officer

JTK:ds

Hearing Officer's Findings of Fact and Decision                                    7

Case No.  112193

---

**PLEASE TAKE NOTICE**

Within 35 days of the receipt of this decision, the parent and/or Board of Education has a right to appeal the decision to the State Review Officer of the New York State Department of Education under Section 4404 of the Education Law and the Individuals with Disabilities in Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25-or 35- day period."(8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal the decision.

Directions and forms for filing an appeal are included with this decision.
Directions and forms can also be found in the office of the State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                                    8

Case No.   112193

---

## **Exhibit List**

**Parent's Exhibits**

| **DATE** | **DOCUMENTS** | **PAGES** |
|---|---|---|
| P-A September 20, 2007 | Demand for Due Process | 03 Pages |
| P-B April 26, 2007 | Findings of Fact and Decision<br>By: IHO Amy L. Itzla | 24 Pages |
| P-C October 29, 2007 | Rebecca School Affidavit of Service | 01 Page |
| P-D October 24, 2007 | IEP | 15 Pages |
| P-E October 5, 2007 | Form M-5 Notice of Committee on<br>Special Education Review Meeting | 02 Pages |
| P-F October 4, 2007 | Social History<br>By: Sharon Tublin, LCSW | 02 Pages |
| P-G October 2007 | DIR Classroom Goals<br>By: Rebecca Starr | 02 Pages |
| P-H September 24, 2007 | Classroom Observation<br>By: Sharon Tublin, LCSW | 02 Pages |
| P-I September 19, 2007 | School/Camp Exam Form<br>Sent from Parent to CSE Region 9 | 05 Pages |
| P-J September 19, 2007 | Letter from Parent to The<br>Rebecca School | 01 Page |
| P-K September 20, 2007 | HIPAA Authorization to Release<br>Health Information with Fax Cover | 04 Pages |
| P-L September 12, 2007 | Letter from Parents to CSE Region 9 | 01 Page |
| P-M September 12, 2007 | E-mail from CSE Region 9 to the Parents | 01 Page |
| P-N July 2, 2007 | Letter to Region 9 from Parents<br>With Fax Confirmation | 03 Pages |

Hearing Officer's Findings of Fact and Decision                                    9

Case No.  112193

_____

| P-O May 23, 2007 | Letter to CSE Region 10 from Parents With Fax Confirmation | 03 Pages |
|---|---|---|
| P-P 2007-2008 | Rebecca School Enrollment Contract With Tuition Payment Schedule and Proof of Payment | 05 Pages |
| P-Q 2007-2008 | Attendance Statement | 01 Page |
| P-R | Throwback Sports Program Brochure | 02 Pages |
| P-S | Throwback Sports Enrollment Contract With Proof of Payment | 02 Pages |
| P-T 2007-2008 | Rebecca School Weekly Schedule | 01 Page |
| P-U | Rebecca School Program Brochure | 02 Pages |